IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ANTONIO C. MONROE,

    Plaintiff,

v.                                              Civil Action No. **3:18CV852**

**DENNIS RIVET,**[1]

    Defendant.

## MEMORANDUM OPINION

Antonio C. Monroe, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this 42 U.S.C. § 1983 action.[2] In his Complaint, Monroe alleges that Dennis J. Rivet, II, M.D. ("Dr. Rivet") subjected him to "cruel and unusual medical practices" in treating him for a "blood clot" inside his head. (ECF No. 4, at 4–5.)[3] The Court construes Monroe to allege a claim of deliberate indifference to his serious medical needs in violation of the Eighth Amendment.[4]

---

[1] Defendant states that Plaintiff inaccurately named him "Dennis Rivet" in the Complaint. (ECF No. 41, at 1.) Defendant's name is Dennis J. Rivet, II, M.D. (*Id.*) The Clerk is DIRECTED to amend the caption of this case to reflect this distinction.

[2] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[3] The Court employs the pagination assigned to the parties' submissions by the CM/ECF docketing system. The Court corrects the punctuation, spelling, and capitalization and omits the emphasis in quotations from the parties' submissions.

[4] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

This matter is before the Court on Dr. Rivet's Motion for Summary Judgment. (ECF No. 41.) Monroe has responded. (ECF No. 47.) Dr. Rivet has filed a Reply. (ECF No. 48.) For the reasons stated below, the Motion for Summary Judgment will be GRANTED.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)). In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere "*scintilla* of evidence" will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a

party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)).

In support of his Motion for Summary Judgment, Dr. Rivet has submitted: (1) Dr. Rivet's affidavit (Mem. Supp. Mot. Summ. J. Ex. 1 ("Rivet Aff."), ECF No. 42-1); (2) an "Index of Medical Records" (*id.* Ex. 2, ECF No. 42-2); and (3) copies of thirty-nine different medical records relating to Monroe's care (*id.* Exs. 3–41, ECF Nos. 42-3 through 42-41).

At this stage, the Court is tasked with assessing whether Monroe "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324.

Monroe responded by filing a document he called "RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT," in which he argues against summary judgment. (ECF. No. 47.)[5] Monroe did not include a "*separate document* titled 'Affidavit' or 'Sworn Statement'" (ECF No. 14, at 2 (emphasis added)), nor does his submission include a jurat, or any other indication that it was ever sworn to before a notary. Consequently, Monroe's response to the Motion for Summary Judgment fails to constitute admissible evidence. *United States v. White*,

---

[5] The Court previously warned Monroe that:

> [T]he Court will not consider as evidence in opposition to any motion for summary judgment a memorandum of law that is sworn to under penalty of perjury. Rather, any verified allegations must be set forth in a separate document titled "Affidavit" or "Sworn Statement," and reflect that the sworn statements of fact are made on personal knowledge and that the affiant is competent to testify on the matters stated therein. *See* Fed. R. Civ. P. 56(c)(4).

(ECF No. 14, at 2.)

3

366 F.3d 291, 300 (4th Cir. 2004). Moreover, Monroe's Complaint was not sworn to under penalty of perjury and likewise fails to constitute admissible evidence. *Id.*

As neither Monroe's Complaint, nor his response to the Motion for Summary Judgment constitute admissible evidence for purposes of summary judgment, Monroe has failed to cite to any evidence that he wishes the Court to consider in opposition. *See* Fed. R. Civ. P. 56(c)(3) (emphasizing that "[t]he court need consider only the cited materials" in deciding a motion for summary judgment). Monroe's complete failure to present any evidence to counter the Motion for Summary Judgment permits the Court to rely solely on Dr. Rivet's affidavit and the supporting medical records in deciding the Motion for Summary Judgment. *See Forsyth*, 19 F.3d at 1537; Fed. R. Civ. P. 56(c)(3) ("The Court need only consider the cited materials . . . .").

In light of the foregoing principles and submissions, the following facts are established for the purposes of the Motion for Summary Judgment. All permissible inferences are drawn in favor of Monroe.

## II. SUMMARY OF UNDISPUTED FACTS

Dr. Rivet is "a medical doctor licensed to practice in the Commonwealth of Virginia" and is "board certified in Neurological Surgery." (Rivet Aff. ¶ 2.) At all relevant times, he was "an associate professor and an attending physician in the Department of Neurosurgery" at Virginia Commonwealth University ("VCU") Medical Center. (*Id.*) Dr. Rivet "was first consulted" regarding Monroe in July 2017. (*Id.* ¶ 5.)[6]

On July 6, 2017, Monroe "presented to VCU Emergency Department for evaluation of chronic intermittent headaches, which he reported since 2012, in the setting of neuroimaging concerning for chronic venous thrombosis versus unusual venous malformation." (*Id.*) Dr. Rivet

---

[6] The Court omits citations to medical records in the citations to Dr. Rivet's affidavit.

4

reviewed "radiological imaging" that Monroe "had undergone at both VCU Medical Center and an outside medical center." (*Id.*) Dr. Rivet "recommended a diagnostic cerebral angiogram to better characterize the lesion" when the "available cross-sectional imaging did not define the exact nature of [Monroe's] vascular malformation." (*Id.*).

On August 11, 2017, Dr. Rivet "met with and examined Monroe." (*Id.* ¶ 6.) Dr. Rivet "explained the procedure to [Monroe] in detail, including the risks, possible complications, benefits and possible alternatives, and [Monroe] agreed to proceed with diagnostic angiography." (*Id.*) Dr. Rivet "then performed a five-vessel diagnostic cerebral angiogram" on Monroe "to define the exact nature of the lesion." (*Id.*)

Dr. Rivet "sequentially" injected contrast "dye" through a catheter in Monroe's femoral artery into "all the blood vessels in" Monroe's "cranial region that supplied this lesion," and he used "fluoroscopy to evaluate and define . . . the anatomic specifics of the arteriovenous malformation to help inform the need for treatment as well as define the best treatment options." (*Id.*). Dr. Rivet "arranged for the presence of an anesthesia provider . . . to minimize any risk and discomfort" to Monroe. (*Id.*)

"The angiogram confirmed [Monroe] had a complex Borden Type 2 dural arteriovenous fistula ('AVF') with severe retrograde cortical venous drainage (RCVD)."[7] (*Id.* ¶ 7.) Monroe's "AVF was supplied by multiple arterial structures." (*Id.*) Monroe's "condition put him at high risk for intracranial hemorrhage, seizures, cerebral edema and neurologic dysfunction." (*Id.*)

---

[7] A dural AVF is an "abnormal connection between an artery and a vein in the tough covering [of] the brain or spinal cord (dura matter)." (Rivet Aff. ¶ 8.) AVFs typically occur "later in life," and have "no clear origin, although some result from traumatic head injury." (*Id.*) Monroe indicated to Dr. Rivet that he "suspect[ed] his condition stemmed from an altercation with police officers in which he was struck in the head." (*Id.*)

5

Dural AVFs may be treated with "endovascular embolization, open surgical resection, radiation therapy, or a combination" thereof, and this is the treatment Monroe received. (*Id.* ¶ 9.) In an endovascular embolization, a catheter is inserted "into a blood vessel" and guided "through the body using fluoroscopy," and then material is injected "into the vessel at the location of the abnormality to occlude it and block the blood supply to the lesion." (*Id.*) "During fluoroscopy, x-ray beams are continually emitted and displayed on a monitor producing a real-time image." (*Id.*) This real-time imaging "allows for dynamic assessment of anatomy and function." (*Id.*) Onyx "is the most commonly used embolization agent for dural AVFs." (*Id.*) It is an FDA-approved "non-adhesive liquid embolic agent." (*Id.*) "An open surgical resection is much more invasive than an endovascular embolization and exposes a patient to additional risk." (*Id.*)

Dr. Rivet discussed the cerebral angiogram at length with Monroe. (*Id.* ¶ 10.) "Given the number of pedicles involved in [Monroe's] dural AVF, an open resection was particularly dangerous as the scalp incision alone could have been life threatening." (*Id.*) Dr. Rivet "recommended attempting endovascular embolization as a first step and [Monroe] agreed." (*Id.*)

"Given the complexity of [Monroe's] dural AVF," Dr. Rivet "recommended performing the embolizations in a staged manner." (*Id.* ¶ 12.) Dr. Rivet explained to Monroe that this recommendation "was based on the expected complexity and length of treatment times required." (*Id.*) Dr. Rivet planned Monroe's "interventions around balancing the risks of prolonged radiation times with working to cure the lesion as efficiently as possible." (*Id.*)

Dr. Rivet discussed with Monroe "the severity of the lesion and the rationale for treatment." (*Id.* ¶ 13.) Dr. Rivet advised Monroe "of the high risk of intracranial hemorrhages of these types of lesions if not treated." (*Id.*) Dr. Rivet also told Monroe about the "specific risks of the procedure including the need to stage the embolization." (*Id.*) Dr. Rivet explained to Monroe "he would likely need multiple treatment sessions" and told Monroe "there was a possibility the endovascular

6

treatment would fail, due to the complexity of the lesion, the ceiling on radiation dosing [Dr. Rivet] felt would be appropriate and the potential for wound healing issues." (*Id.*) Dr. Rivet further told Monroe there was a likelihood he "would still require an open surgical resection." (*Id.*) Finally, Dr. Rivet disclosed to Monroe other potential "risks of the procedure including venous infarction if the venous outflow were occluded, risk of radiation exposure such as hair loss or skin changes which may be permanent, retained catheter, risk of scalp necrosis if blood flow was compromised . . . as well as stroke and even death." (*Id.*)

Monroe's "initial embolization procedure was scheduled for September 25, 2017." (*Id.* ¶ 14.) Dr. Rivet met with Monroe personally and "discussed the procedure in detail, the potential risks and complications and the expected hospital course." (*Id.*) Monroe "had the opportunity to ask questions" and "signed the surgical consent form acknowledging he understood the risks." (*Id.*)

On September 25, 2017, Dr. Rivet "performed another diagnostic cerebral angiogram and an Onyx embolization of the dural AVF via the left occipital branch." (*Id.* ¶ 15.) Dr. Rivet "arranged for continuous Somatosensory Evoked Potentials Neuromonitoring (SSEP) during the procedure." (*Id.*) SSEP "provided real time monitoring of the nerve pathways responsible for a patient's feeling of pressure, touch, temperature, and pain." (*Id.*) SSEP reassured Dr. Rivet that Monroe "was not experiencing any neurological problems as a result of the surgery." (*Id.*) Dr. Rivet "continuously monitored the amount of radiation exposure necessitated by the procedure while working to efficiently embolize as many vessels as possible in a safe manner." (*Id.*) Dr. Rivet "was able to partially embolize the dural AVF via the left occipital branch." (*Id.*) Dr. Rivet then "determined it would be best to attempt staged embolization of the remaining lesion via an approach through a different vessel at a later date." (*Id.*) Monroe stayed in the hospital overnight and was monitored closely. (*Id.*)

After the September procedure, Monroe was discharged and "given materials which included Clinical Radiation Safety Departure Instructions." (*Id.* ¶ 18.) The materials provided "described specific skin and hair changes [Monroe] might see following the procedure as well as contact information for the Clinical Radiation Safety Office in the event he experienced any symptoms." (*Id.*)

Monroe was scheduled for another procedure on October 30, 2017. (*Id.* ¶ 19.) Dr. Rivet met with Monroe on October 30, 2017, and "discussed the procedure in detail, as well as the potential risks and complications and the expected hospital course." (*Id.* ¶ 20.) Monroe "had the opportunity to ask questions," and again he signed a "surgical consent form acknowledging he understood the risks." (*Id.*).

That same day, Dr. Rivet "performed another diagnostic cerebral angiogram and onyx embolization of the dural AVF via the left superficial temporal and occipital artery." (*Id.* ¶ 21.) Dr. Rivet again "arranged for continuous intraoperative SSEP, which confirmed [Monroe] did not experience any neurological complications." (*Id.*) Dr. Rivet "continuously monitored the amount of radiation" that Monroe was exposed to while embolizing the effected blood vessels. (*Id.*) Dr. Rivet "successfully obliterate[d] the left external carotid artery supply to the left side of the lesion." (*Id.*) However, the right side of the lesion still had a significant supply of blood. (*Id.*) Dr. Rivet opted to "stage" the remaining "embolizations to a later date in order to stage the radiation exposure necessitated by the . . . complexity of the lesion." (*Id.*) Monroe stayed in the hospital overnight and was closely monitored. (*Id.*)

On October 31, 2017, Dr. Rivet personally examined Monroe. (*Id.* ¶ 22.) At that time, Monroe "had no neurological complaints, was hungry and anxious for discharge." (*Id.*) Monroe "did report a mild headache," which Dr. Rivet did not view as unexpected given the nature of the procedure and Monroe's underlying condition. (*Id.*) Dr. Rivet discussed his "intraoperative

8

findings" with Monroe in detail. (*Id.*) Dr. Rivet "explained the need for further embolization of the right-sided blood supply." (*Id.*) Dr. Rivet told Monroe about "the amount of radiation exposure" that Monroe "had encountered . . . and advised him of the possible risks, which included hair loss and skin changes." (*Id.*) Dr. Rivet discussed with Monroe "the benefits and risks of an endovascular approach with subsequent radiation exposure versus operative intervention." (*Id.*) Dr. Rivet recommended another embolization procedure in four to six weeks, "as he felt it was the best option at that point." (*Id.*) At that time, Monroe "wished to proceed with further endovascular treatment." (*Id.*)

On November 11, 2017, Dr. Rivet was advised that Monroe "was receiving treatment at the prison where he was incarcerated for hair loss, skin reddening and serosanguineous oozing in an area behind his left ear toward the back of his head." (*Id.* ¶ 23.) Dr. Rivet "immediately" requested that the prison clinic "arrange an appointment," so that he "could personally evaluate [Monroe's] wound and provide any required treatment at the VCU clinic." (*Id.*)

Monroe was scheduled for an outpatient visit with Dr. Rivet on November 29, 2017. (*Id.* ¶ 24.) However, on November 26, 2017, Monroe returned to VCU "and was admitted as an inpatient to the Neurosurgery service with a left scalp wound concerning for possible radiation/Onyx necrosis of the scalp with possible infection." (*Id.*) "Specialists in both Plastic Surgery and Infectious Disease were immediately consulted." (*Id.*) The plastic surgeon "performed a bedside wound debridement and a culture of the wound was obtained to determine appropriate antibiotic therapy." (*Id.*) Monroe was hospitalized through November 29, 2017. (*Id.*) All the while, Dr. Rivet "worked closely with colleagues in the Neurosurgery department as well as the consultants in Plastic Surgery and Infectious Disease to monitor and care for [Monroe's] scalp wound." (*Id.*)

On November 27, 2017, Dr. Rivet personally examined Monroe. (*Id.* ¶ 25.) Dr. Rivet discussed the case with a plastic surgeon named Dr. Le, and they "agreed to treat [Monroe] with IV antibiotics as recommended by Infectious Disease and to periodically reinspect the wound to assess healing and determine whether any type of operative intervention such as a skin graft or flap was required." (*Id.*) Monroe's "wound healed with antibiotics and topical management and more invasive treatment was not required." (*Id.*) Dr. Rivet and his colleagues "arranged for an MRI which confirmed there was no osteomyelitis (bone infection)." (*Id.*) Monroe received a "PICC line . . . for planned long-term IV antibiotic therapy." (*Id.*)

On November 28, 2017, Dr. Rivet examined Monroe again. (*Id.* ¶ 26.) Dr. Rivet "planned to perform close surveillance of the wound and then proceed with definitive surgery for the remaining dural AVF only after Monroe's healing had maximized." (*Id.*)

On November 29, 2017, Dr. Rivet discharged Monroe from VCU. (*Id.* ¶ 28.) Monroe "transferred to a correctional facility with a medical unit as he required daily wound care and IV antibiotics." (*Id.*) Dr. Rivet provided written instructions for Monroe's "daily wound care" and Dr. Rivet "requested weekly labs be drawn at the facility and faxed to [him]." (*Id.*) Dr. Rivet scheduled Monroe for a follow-up appointment in early December of 2017. (*Id.*)

Dr. Rivet "monitored [Monroe's] progress over the next several months and performed wound care." (*Id.* ¶ 30.) Between December 6, 2017, and January 2, 2018, Dr. Rivet personally examined Monroe three times in the clinic. (*Id.*) Dr. Rivet also "requested that a plastic surgeon examine [Monroe] on multiple occasions . . . and provide his expert opinion on the recommended timing and plan of care." (*Id.*) Monroe's scalp wound continued to show signs of improvement on each visit. (*Id.*) Around this time, Monroe's IV antibiotics were discontinued because he showed no signs of lingering infection. (*Id.*)

On January 26, 2018, Monroe was treated at VCU for "some drainage from his scalp wound" and was given oral antibiotics. (*Id.* ¶ 31.) On February 14, 2018, Dr. Rivet met with Monroe in the clinic. (*Id.* ¶ 32.) Monroe said he was "feeling much better and was anxious to proceed with surgery to treat the remaining dural AVF." (*Id.*) Dr. Rivet discussed the upcoming surgery with Monroe "in detail and advised him of the potential risks." (*Id.*) Monroe "indicated he wanted to proceed and signed a consent form." (*Id.*) Dr. Rivet consulted with Dr. Le, and Dr. Le "recommended additional time for wound healing prior to surgery." (*Id.*) Dr. Le "planned to see [Monroe] on an ongoing basis and then advise [Dr. Rivet] when he felt the wound had sufficiently healed to allow for further surgery." (*Id.*)

On April 17, 2018, Dr. Rivet met with Monroe. (*Id.* ¶ 33.) Monroe's "wound healing had progressed significantly." (*Id.*) Dr. Rivet "spent approximately 25 minutes counseling" Monroe about his upcoming surgery, "which would include a biparietal craniotomy and obliteration of the remaining dural AVF." (*Id.*) Dr. Rivet discussed with Monroe the "goals of care, the anatomy and a typical recovery." (*Id.*) Dr. Rivet "drew a diagram" for Monroe and described his planned "approach and technique." (*Id.*) Dr. Rivet disclosed to Monroe "the risks of the open resection which included bleeding, stroke, seizures, blood transfusion, weakness, coma and even death." (*Id.*) Monroe "indicated he understood the risks associated with his lesion, the possibility he might experience difficult wound healing and that he might ultimately require skin grafting." (*Id.*)

On May 11, 2018, Dr. Rivet met with Monroe. (*Id.* ¶ 34.) Once again, Dr. Monroe discussed the procedure with Monroe in detail, "including the potential risks and complications and expected hospital course." (*Id.*) Monroe was given "an opportunity to ask questions." (*Id.*) Dr. Rivet "noted 'update 5/11/18' on the consent form [Monroe] had previously signed." (*Id.*)

Later that day, Dr. Rivet "performed an intraoperative angiogram, parietal craniotomy and obliteration of dural AVF." (*Id.* ¶ 35.) Dr. Rivet "arranged for Dr. Le to be available for wound

11

closure assistance if needed in light of the complexity of Monroe's case." (*Id.*) Dr. Le joined Dr. Rivet "in the operating room and evaluated the wound status with" Dr. Rivet. (*Id.*) As a result of the surgery, Dr. Rivet "was able to successfully obliterate the remaining dural AVF." (*Id.*) Dr. Rivet "performed a diagnostic angiogram at the conclusion of the case to insure there was no remaining fistulous connection." (*Id.*) Monroe "did not require any skin grafting or a flap procedure." (*Id.*) Monroe "tolerated the procedure well and was transferred to the neurosurgical intensive care unit for close monitoring postoperatively." (*Id.*) Monroe stayed in the hospital for two nights following the surgery and then was "discharged in stable condition." (*Id.*)

On May 22, 2018, Dr. Rivet saw Monroe for a postoperative visit. (*Id.* ¶ 36.) Monroe "was doing well with no apparent complications." (*Id.*) Monroe's "incision was well-healed" and Dr. Rivet "removed his staples." (*Id.*) Dr. Rivet advised Monroe "of signs to watch for and planned to continue intermittent surveillance." (*Id.*) Dr. Rivet planned to see Monroe in one year to "perform another angiogram . . . to confirm obliteration of the fistula." (*Id.*)

On October 19, 2018, Dr. Rivet saw Monroe again in clinic. (*Id.* ¶ 37.) Monroe "reported multiple episodes of onyx extrusion mostly adjacent to his incision." (*Id.*) Dr. Rivet examined Monroe and "observed some punctate areas where onyx had extruded previously," although Monroe's "skin appeared intact." (*Id.*) Dr. Rivet "discussed the need for regular chlorhexidine washes" with Monroe. (*Id.*) Monroe "denied any symptoms of infection or other complaints." (*Id.*) Dr. Rivet planned an angiogram for Monroe in November and "planned to evaluate the area again at that time and consult with Dr. Le if [Monroe] had continued problems." (*Id.*)

On November 5, 2018, Dr. Rivet saw Monroe for the last time. (*Id.* ¶ 38.) Dr. Rivet "performed another diagnostic cerebral angiogram, which confirmed that there was no evidence of any residual dural AVF." (*Id.*) Monroe's scalp had "healed completely" at that time. (*Id.*) Dr. Rivet has not seen Monroe since. (*Id.*)

## III. ANALYSIS

In order to survive summary judgment for a claim under 42 U.S.C. § 1983, a plaintiff must "affirmatively show[] that the official charged acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)). To establish an Eighth Amendment violation, Monroe must demonstrate that Dr. Rivet acted with deliberate indifference to his serious medical needs. *See Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001). A medical need is "serious" if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

The subjective prong of a deliberate indifference claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (citing *Farmer*, 511 U.S. at 837). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm. . . . [and] that the official in question

13

subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

In evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim. *See Wright*, 766 F.2d at 849 (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).

Monroe alleges that Dr. Rivet acted with deliberate indifference to Monroe's serious medical needs when he failed to provide proper medical care for the "blood clot" in Monroe's head. (ECF No. 4, at 4–5.) As discussed below, Monroe fails to establish that Dr. Rivet actually knew of and disregarded a serious risk of harm to Monroe. To the contrary, the record establishes that Monroe received extensive medical care from Dr. Rivet to address both his AVF and the various ongoing complications associated with his treatment.

In July of 2017, Monroe had been suffering from "chronic intermittent headaches" for approximately five years, since 2012. (Rivet Aff. ¶ 5.) Dr. Rivet examined Monroe, conducted appropriate diagnostic tests and concluded that Monroe suffered from an AVF, with severe RCVD, a life-threatening condition that was "complex, dangerous and challenging to treat." (*Id.* ¶ 7.)

Treatment options were limited to endovascular embolization, open surgical resection, radiation therapy, or a combination thereof. (*Id.* ¶ 9.) Due the complexity of the condition, Dr. Rivet recommended a "staged" approach to treatment that included a combination of the available treatment options. (*Id.* ¶¶ 9, 12.) Dr. Rivet informed Monroe of the multiple and significant risks

attendant to both the condition and the proposed course of treatment and obtained informed, written consent before delivering care. (*Id.* ¶¶ 14, 19–20, 29, 32, 34.)

Over the course of more than a year, Dr. Rivet undertook the tedious process of treating Monroe's AVF. This included multiple complex procedures and surgical interventions. (*Id.* ¶¶ 5–38.) When Monroe experienced complications, Dr. Rivet promptly responded and addressed the issues, which were largely the sort of issues that Dr. Rivet had anticipated and warned Monroe about prior to beginning treatment. (*Id.* ¶¶ 23–29.)

When Monroe's condition presented challenges outside of Dr. Rivet's field of expertise, Dr. Rivet promptly enlisted the assistance of experts in the fields of plastic surgery and infectious medicine to consult and provide guidance. (*Id.* ¶¶ 24–25, 30, 32, 35.) Dr. Rivet maintained "close surveillance" of Monroe's condition and was willing to adjust the course of treatment to allow Monroe to heal properly before engaging in the subsequent stages of treatment. (*Id.* ¶¶ 26, 32.)

By May of 2018, Dr. Rivet was able to "successfully obliterate" the remaining portions of Monroe's AVF. (*Id.* ¶ 35.) Dr. Rivet, in conjunction with the outside consultants that he had recruited to assist, continued to provide aftercare for Monroe for another approximately six months, until November of 2018. (*Id.* ¶¶ 35–38.) On November 5, 2018, Dr. Rivet performed "another diagnostic cerebral angiogram which confirmed [that] there was no evidence of any residual dural AVF." (*Id.* ¶ 38.) Dr. Rivet determined that Monroe's "lesion was completely eradicated," and "[h]is scalp had . . . healed completely." (*Id.*)

To the extent Monroe was not satisfied with the manner in which Dr. Rivet addressed his pain or discomfort, there is no evidence to indicate that Dr. Rivet was deliberately different to Monroe's condition in this regard. *Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir. 1996) ("Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations."). This case does not represent

the sort of "extreme" circumstance that would necessitate judicial interference in the realm of medicinal pain management. *C.f. Martinez v. Mancusi*, 443 F.2d 921, 924–25 (2d Cir. 1970) (granting relief when doctor forced prisoner to walk out of hospital without hospital-ordered pain medication and stand for meals after plaintiff had leg surgery for which hospital specialist had ordered plaintiff to lie flat and not to walk); *see also Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) (observing that the right to medical treatment is limited to that which is medically necessary and not "that which may be considered merely desirable").

Overall, the uncontroverted evidence establishes that Dr. Rivet was not deliberately indifferent to Monroe's AVF or the complications attendant to his treatment. *Brown*, 240 F.3d at 389 ("[A]n official who responds reasonably to a known risk has not 'disregard[ed] an excessive risk to inmate health or safety,' and has therefore not acted with deliberate indifference." (second alteration in original) (quoting *Farmer*, 511 U.S. at 837)). Instead, Dr. Rivet provided extensive treatment for a complex and serious medical condition. In sum, Monroe fails to establish that Dr. Rivet subjectively recognized a serious risk of harm to Monroe and chose to ignore that risk. *Farmer*, 511 U.S. at 837. Accordingly, Monroe's claim will be DISMISSED.

## IV. CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment (ECF No. 41) will be GRANTED. Monroe's claim and the action will be DISMISSED.

An appropriate Order will accompany this Memorandum Opinion.

Date: 22 February 2021
Richmond, Virginia

/s/
John A. Gibney, Jr.
United States District Judge